**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

**MICHAEL SCARBORO, OLAN DOCTOR,**
**YOLANDA JOHNSON, GLORIA PARKER,**
**VINCENT ANDERSON, WILLIE BACKUS,**
**BARBARA ROBINSON, PEGGY ADAMS,**
**JOHN TOWLER, MAJOR PURYEAR,**
**JASON SKEETE, JOHNNY MCKOY,**
**MARY JOHNSON, MARGARET ELEY,**
**SALVADORE COOPER, LINDA CHARITY,**
**NATHAN ROBINSON, JOE BRANCH,**
**RADIA CAPEHART,** *on behalf of themselves*
*and all others similarly situated,*

       **Plaintiffs,**

**v.**                                            **Civil Action No.**

**BENJAMIN WEINSTEIN,**
**BLUE RISE GROUP, LLC,**
**and**
**SEAVIEW APARTMENTS LLC,**

       **Defendants.**

## <u>CLASS ACTION COMPLAINT</u>

COME NOW the Plaintiffs, MICHAEL SCARBORO ("Mr. Scarboro"), OLAN DOCTOR

("Mr. Doctor"), YOLANDA JOHNSON ("Ms. Johnson"), GLORIA PARKER ("Ms. Parker"),

VINCENT ANDERSON ("Mr. Anderson"), WILLIE BACKUS ("Mr. Backus"), BARBARA

ROBINSON ("Ms. Robinson"), PEGGY ADAMS ("Ms. Adams"), JOHN TOWLER ("Mr.

Towler"), MAJOR PURYEAR ("Mr. Puryear"), JASON SKEETE ("Mr. Skeete"), JOHNNY

MCKOY ("Mr. Mckoy"), MARY JOHNSON ("Ms. Johnson"), MARGARET ELEY ("Ms.

Eley"), SALVADORE COOPER ("Mr. Cooper"), LINDA CHARITY ("Ms. Charity"), NATHAN

ROBINSON ("Mr. Robinson"), JOE BRANCH ("Mr. Branch"), and RADIA CAPEHART ("Ms.

Capehart"), (hereafter collectively as the "Plaintiffs"), on behalf of themselves and all others similarly situated, by counsel, and as for their Class Action Complaint against Defendants, BENJAMIN WEINSTEIN (hereafter "Mr. Weinstein"), BLUE RISE GROUP, LLC (hereafter "Blue Rise Group" or "Blue Rise"), and SEAVIEW APARTMENTS LLC (hereafter "Seaview Apartments"), they state as follows:

## PRELIMINARY STATEMENT

1.      Defendants own and run a 15-story apartment building in Newport News, the Seaview Lofts, that has recently been the subject of multiple Show Cause and Injunction Orders requiring Defendants to maintain, repair and operate the two elevators in the building. Even after months of such efforts by the City of Newport News and the Newport News Circuit Court, Defendants have refused to comply.

2.      The problem is that this refusal targets and has a disparate effect on the Plaintiffs and other disabled tenants who are otherwise unable to reach (or leave) their homes, and now will have a much more difficult time moving somewhere else.

3.      Defendants' conduct violates and this action is brought under the Federal Fair Housing Act, ("FHA"), specifically 42 U.S.C. § 3604. Plaintiffs are typical of a class of similarly-situated tenants and seek to represent them on a class action basis.

4.      Plaintiffs seek a preliminary and permanent injunction through Fed. R. Civ. P. 23(b)(2). They seek actual and punitive damages, costs and attorneys' fees individually.

## JURISDICTION AND VENUE

5.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## PARTIES

6.      Each of the Plaintiffs is an aggrieved person under the FHA as that term is defined

under the Act.  Each resided at the Seaview Lofts until forced to move recently.

7.    Mr. Towler is a military veteran amputee who uses a wheelchair for daily mobility. Mr. Skeete is a disabled military veteran. Mr. Scarboro is paralyzed in one arm and also uses a wheelchair for daily mobility. Ms. Johnson, Mr. Anderson, and Ms. Eley use a walker to ambulate. Each becomes tired and pained by ambulation, even with their assistive devices. Each Plaintiff either has great difficulty managing stairs or cannot use them at all. Each Plaintiff is and at all times herein relevant was a "handicapped person" as defined by 42 U.S.C. § 3602, and a "person with a disability" as defined in 29 U.S.C. § 705(9)(B).

8.    Mr. Doctor has a history of cancer and heart valve issues. Ms. Parker is disabled, has kidney issues and is on oxygen from chronic obstructive pulmonary disease (COPD). Mr. Backus is on oxygen and ambulates with a cane. Ms. Robinson has diabetes, hypertension and has two stents in her heart. Ms. Adams is disabled from knee issues and she is a diabetic. Mr. Puryear is disabled and is a diabetic. Mr. McKoy has knee issues and suffers from hypertension. Ms. Johnson is a senior citizen with asthma. Mr. Cooper has a long history of heart problems. Ms. Charity has had knee and back surgeries leaving her with limited mobility. Mr. Robinson has arthritis in his knees. Mr. Branch has diabetes and hypertension. Ms. Capehart has a history of back issues and post-traumatic stress disorder.

9.    Defendant Benjamin Weinstein is a New Jersey resident who is the legal owner of Blue Rise Group and the 15-story high-rise in Newport News, Virginia known as the Seaview Apartments LLC d/b/a Seaview Lofts, located at 2 28th St, Newport News, VA 23607.

10.    Blue Rise Group was founded in 2013 by Ben Weinstein to serve as the entity to operate his real estate acquisition and management.  It is used to operate various multi-family properties Weinstein owns (either directly or through shell companies).

11.    Seaview Apartments LLC used to be a Virginia-LLC created by Weinstein as the shell entity for Seaview Lofts.  It was terminated by automatic cancellation earlier this year.  In its absence, as before, Weinstein has continued his hands-on management and control.

## FACTS COMMON TO ALL CAUSES OF ACTION

### Ben Weinstein, Blue Rise Group and Seaview Apartments LLC

12.    "The  'simple definition' of slumlord,  according  to  the  Merriam-Webster dictionary, is 'a person who owns a building with apartments that are in bad condition and rents them to poor people.'"  Ezra Rosser, *Exploiting the Poor: Housing, Markets, and Vulnerability A Book Review of Matthew Desmond, Evicted: Poverty and Profit in the American City (Crown Publishers, New York, 2016)*, 126 Yale L.J. Forum 458, 461 (2017).

13.    Mr. Weinstein uses his various corporate shells to own and operate buildings with apartments that are in bad condition and rent them to poor people.  He does it through multiple apartment complexes in the Northeastern United States, and following this pattern he uses his New Jersey "management" companies to do the same here in our city, Newport News.

14.    Mr. Weinstein purchased the Seaview Apartments in 2020, as the Covid Pandemic was in full effect.  And he was smart to do so, because from just March 2021 until July 2022, he and his shell company have collected over $482,222.01 in government money intended to cover the rents of many of his tenants.

15.    And yet, despite purchasing a 15-story building for $9.3 million and receiving both private rents averaging over $900/month plus government money, Defendants have invested almost nothing into the building.   Since taking over, Seaview has been informed of numerous – NUMEROUS – health, safety and codes compliance violations.  They have gone through overtaxed and hardly paid "property managers" and have rejected maintenance proposals because

they were too costly.  And now, Defendants have refused to comply even with a state Circuit Court Show Cause Order and Emergency Injunction.

16.     Neither Seaview Apartments LLC nor Blue Rise are viable and independent legal entities.  Weinstein has removed any income either had received and has not maintained corporate formalities.

17.     In fact, discovery will show that the Defendants do not operate as separate personalities.  Decisions, communications, management and money are handled as one.  In fact, "Seaview Apartments, LLC" is merely "the alter ego, alias, stooge, or dummy of" its co-Defendants and was here used as a "device or sham used to disguise [the] wrongs [and] obscure fraud" and "to commit an injustice [and] gain an unfair advantage" against Plaintiffs and, the Class and other tenants.  *C.F. Tr., Inc. v. First Flight L.P.*, 266 Va. 3, 10, 580 S.E.2d 806, 809–10 (2003) Discovery will show that Defendants here collected substantial rents, yet rather than use a lawfully appropriate and sufficient amount to cover basic and minimal maintenance and operations expenses, they have depleted, removed and bled dry the assets of Seaview Apartments LLC. Defendants have allowed the Seaview Apartments LLC to cancel and have terminated most or even all employees of the entity.

18.     Independent of any veil-piercing or corporate dissolution, both Blue Rise and Weinstein are directly liable as each engaged directly and personally in the discriminatory practices alleged herein.  Each made the decisions that are discriminatory and violated the federally protected rights of the Plaintiffs and each Class member. Each intentionally removed money they knew necessary and legally required to avoid the alleged violations.  In fact, all three Defendants – including Weinstein – were personally and individually involved in each discriminatory act alleged herein.

**The Seaview Lofts and City of Newport News Legal Action**

19.     The Seaview Lofts is a 15-story apartment building, built in the 1970s, but worth roughly $10 million. It is not Section-8 housing and Defendants charge substantial rents. Nevertheless, the building is rented disproportionately to lower-income, minority tenants. A significant number of them are elderly and/or disabled.

20.     The building was built in approximately 1973 and recently "renovated." Seaview asserts: "Our community is presently undergoing extensive renovations! Our apartment homes have brand new kitchens, stainless steel appliances, flooring, bathrooms, and so much more! All units have a private balcony with beautiful ocean views or city views."

21.     The apartments are served by two elevators into the building, as an alternative to the stairs rising the whole fifteen stories. The elevators comprise the sole method of ingress and egress for those who cannot easily climb or descend stairs, such as Plaintiffs herein.

22.     The public and common use areas in the building are required to be readily accessible to and useable by disabled persons. This would include an accessible path of travel from public transportation and private parking to the dwelling unit. Such path of travel in a fifteen-story building necessarily requires a useable and accessible elevator. Further, the dwelling units are required to contain the features of accessible design including an accessible route through the dwelling unit, accessible locations for light switches, electrical outlets, thermostats and other environmental controls, reinforced bathroom walls for the later installation of grab bars and accessible kitchens and bathrooms. On information and belief, many of the required access features either were not installed or not maintained properly.

23.     The elevators in the building have not been maintained and have repeatedly malfunctioned to such a degree that they have had to be taken repeatedly out of service.

24.     When the elevators have had to be taken out of service, Defendants have delayed restoring service repeatedly and unreasonably, forcing disabled residents to attempt to negotiate the stairs to their great pain, embarrassment, discomfort and personal injury or, to be prisoners in their home.

25.     Regardless of the reason the elevator and/or lift had to be taken out of service, Defendants have failed and refused to institute policies and procedures to maintain these necessary elements of the accessible path of travel for disabled residents and to modify policies and procedures to accommodate disabled residents' special needs during periods when they are out of service.

26.     Defendants have failed and refused to keep residents reasonably informed of the length of time the elevators were expected to be out of service; they continually fail and refuse to grant reasonable accommodations such as hotels for the duration of service interruptions; and/or fail to inform tenants that such accommodations are available. Even when hotel rooms have been provided in response to Plaintiffs' reasonable accommodation requests, Defendants have behaved inconsistently, at times offering only unsafe facilities in unsafe neighborhoods and/or requiring their extremely low-income tenants to pay for the accommodations up front and unreasonably delaying reimbursement.

27.     Defendants have actual knowledge that each of the Plaintiffs is a person with a mobility disability because each Plaintiff has spoken directly to building management and employees about his or her disabilities, and has requested assistance from building employees to accommodate his or her disabilities.

28.     On or about March 10, 2022 an unknown tenant notified the City of Newport News that one of the two elevators in Seaview Apartments had been inoperable for months. A property

maintenance inspector, David Elswick, investigated and found that only one elevator was in operation. The City gave Seaview Apartments thirty days to repair.

29.    On April 11, 2022, two Newport News City inspectors, Alphonso Johnson and David Elswick, discovered the second elevator was inoperable.

30.    On June 28, 2022, the City of Newport News condemned the building for multiple violations to include: hazardous electrical systems, fuel-burning equipment not properly vented, fire detection system not maintained, mechanical appliances not installed properly, failed to maintain elevators, heating/air issues, plumbing fixtures not installed/maintained properly, light required for habitable space not provided, and multiple failed property maintenance inspection. The tenants were given 48 hours to evacuate.

31.    On July 6, 2022, Seaview Apartments was declared an unsafe structure.

32.    When the elevators are out of service, the disabled tenants miss doctors' appointments. They miss social opportunities and family gatherings. They have to get someone else to do their grocery shopping for them and run errands they otherwise would do for themselves. Each Plaintiff herein has personally suffered injuries, including physical injury, pain, emotional distress, difficulty, discomfort or embarrassment due to Defendants' ongoing pattern of discriminatory behavior, policies, practices, actions and/or omissions.

33.    The following are illustrative but not comprehensive examples of the damages caused by Defendants' discriminatory behavior:

**MICHAEL SCARBORO**

34.    Michael Scarboro is a 71-year-old disabled, black male that lived in Seaview Lofts, Apt. 12-F, prior to its condemnation.

35.    Mr. Scarboro has a history of strokes and heart attack, is in a wheelchair, and cannot

use his right arm.

36.     Mr. Scarboro lives with his wife, Elise Scarboro, in the unit and he has experienced most of the same failures, dangers, and difficulties alleged herein generally and by other tenants.

37.     Mr. Scarboro stayed in a city-funded hotel until the City no longer funded that relief. He is currently homeless, living in and out of hotels.

**BARBARA ROBINSON**

38.     Barbara Robinson is a 62-year-old black female that has lived at Seaview Lofts since 2018. Ms. Robinson suffers from diabetes, hypertension, and has two stents for her heart arrhythmia. Her heart and health conditions cause her exhaustion when put under physical stress, such as walking up stairs.  Ms. Robinson reports that the elevators were regularly out of service and it caused her extreme pain to have to use the stairs.

39.     Ms. Robinson also reports that the eighth-floor hallway would flood from a leak on the fifteenth floor that leaked to her floor. Ms. Robinson's apartment was water-damaged due to leaks inside the walls that caused mold and flooding.

40.     Her insurance company paid for a hotel for two months in early 2022 until her water damage was finally mitigated enough for her to return to her unit. The entire building was without functioning heat or air conditioning in 2021 until around October 2021.

41.     Since the condemnation of the building, Ms. Robinson stayed in the city-funded hotels until the City no longer funded that relief on July 14, 2022. After that, she began staying with various relatives until she was able to find a house and moved in on August 1. She has not been able to access her apartment to gather her things.

**JOHN TOWLER**

42.     John Towler is a 55-year-old disabled, black male and military veteran that has

lived in Seaview Lofts since September 2017.

43.    He is a lower, left leg amputee and has a portion of his right foot amputated as well. He suffers from diabetes and hypertension. He was assigned apartment 7-G on the 7th floor.

44.    Mr. Towler lives with his brother, Major Puryear, in the unit and has experienced numerous maintenance issues that have continued to go unresolved.

45.    Mr. Towler has reported and experienced black mold, exposed holes from leaking walls and ceiling, the ceiling consistently leaks during storms, a lack of air conditioning for the majority of the summer in 2021, and a lack of building heat from 2021 to early 2022.

46.    Mr. Towler has also had to deal with a roach and rodent infestation. The building used to have regular commercial pest control services weekly, but that was eliminated completely in early 2022 and the issue has gotten progressively worse.

47.    Mr. Towler reports that the elevators were out of service for an extended period of time in mid-2021 and again in early 2022. This military veteran had to crawl up seven flights of stairs on his stomach and back to reach his apartment in order to get his insulin. He has long been affected negatively due to the lack of continually working/safe elevators.

48.    Since the condemnation of the building, Mr. Towler stayed in the city-funded hotels until the City no longer funded that relief on July 14, 2022. The City extended his stay for one week due to his disability, but has not funding anything beyond July 21, 2022.

49.    Mr. Towler has been visiting the Veterans Affairs Hospital for help, meeting with City staff, and has had several friends calling apartments looking for availability, but to this point has not found anything available. This is causing additional stress because his disability limits what he can do for himself, so he requires assistance with rides to look for apartments and for most of his daily tasks. His blood pressure has been elevated, due to his lack of access to his insulin, his

blood sugar has risen, and he is self-reporting severe depression due to his unknown future.

**MARGARET ELEY**

50.    Margaret Eley is an 80-year-old disabled black woman who has lived at SeaView Lofts since 2011.

51.    Ms. Eley is retired and lives on Social Security. Ms. Eley suffers from severe back and knee issues resulting from several surgeries that requires the use of a walker or scooter to get around.

52.    Ms. Eley says that her apartment has leaks in her bathroom ceiling, her dishwasher has not worked for four years, a broken window that has not been fixed in two years, and since the complex stopped paying for pest control in early 2022, she has dealt with an influx of rats and roaches.

53.    She says that the heat and A/C were out of service for the whole building for most of 2021.

54.    The elevators were out of order for several weeks in early 2022, which really caused Ms. Eley severe issues given her limited mobility. She was unable to safely get up and down the stairs.

55.    Since the condemnation of the building, Ms. Eley stayed in the city-funded hotels until the city no longer funded that relief on July 14, 2022. She has been paying for a hotel out of her own pocket since then, but she is quickly depleting what little funds she has saved.

56.    Ms. Eley is very worried and confused, the situation is causing added stress and anxiety. She has no permanent plan for living arrangements beyond the temporary hotel stay and is concerned she is going to run out of money.

**YOLANDA JOHNSON**

57.    Yolanda Johnson is a 56-year-old, disabled black female that lived in Seaview Lofts, Apt. 2-J, prior to its condemnation.

58.    Ms. Johnson has severe asthma, degenerative bone disease, has undergone two knee replacements, and has thyroid issues.

59.    Ms. Johnson has experienced most of the same failures, dangers, and difficulties alleged herein generally and by other tenants including water leaks and lack of access to an operational elevator.

60.    Ms. Johnson stayed in a city-funded hotel until the City no longer funded that relief on or about July 14, 2022. As of the date of this Complaint, Ms. Johnson doesn't have a place to live and is sleeping on a friend's couch with her two grandchildren.

**NATHAN ROBINSON**

61.    Nathan Robinson is a 56-year-old black man tenant of the Seaview Lofts since Summer 2020.  He suffers from knee arthritis and diabetes. He is a shipyard worker who is on the Covid Rent Relief Program.

62.    Upon moving into Seaview Lofts in 2020, Mr. Robinson moved into a "newly renovated" fifteenth floor apartment.

63.    In 2022, without the availability of operable elevators, fifteen flights of stairs were a challenge on his knees and caused unnecessary pain and wear on his already arthritic knees.

64.    Since the condemnation of the building, Mr. Robinson stayed in the city-funded hotels until the City no longer funded that relief on July 14, 2022. He has since been sleeping in his car, which has presented heat issues, added stress, and severe feelings of depression.

65.    Mr. Robinson was already struggling financially at the time this occurred. He has limited resources to pay for a new apartment. The apartment complexes he has contacted since the

condemnation of Seaview Lofts have not had any openings. He hopes the building will be fixed so he can access his belongings. Mr. Robinson is homeless, living in his car, and is severely depressed.

**OLAN DOCTOR**

66.    Olan Doctor is a 75-year-old black male that lived in Seaview Lofts, Apt. 11-B, for several years prior to its condemnation.

67.    Mr. Doctor has a history of heart valve issues and cancer.

68.    Mr. Doctor has experienced most of the same failures, dangers, and difficulties alleged herein generally and by other tenants including climbing up nearly a dozen flights of stairs for three weeks while the elevator was shut down prior to the condemnation.

69.    Mr. Doctor stayed in a city-funded hotel until the City no longer funded that relief on July 14, 2022. As of the date of this Complaint, Mr. Doctor doesn't have a place to live and is sleeping on a friend's couch but has to leave within the next week.

**VINCENT ANDERSON**

70.    Vincent Anderson is a 74-year-old disabled veteran and has lived at Seaview Lofts since 2011.  Mr. Anderson suffers from chronic obstructive pulmonary disease (COPD), and has had two heart valve replacements.

71.    Mr. Anderson requires the use of a walker to ambulate any distance greater than a few yards. Walking upstairs is nearly impossible in Mr. Anderson's condition. He was never on the Covid Rent Relief Program and always pays his rent on time.

72.    Mr. Anderson reports that the elevators were regularly inoperable, and both were inoperable for a few weeks in early 2022 and then again in June 2022.

73.    Mr. Anderson reports that the entire building was without functioning heat or air

conditioning from early 2021 until around October 2021. He regularly has water leaking into his apartment from the roof leaking. Despite numerous reports in-person to management staff, the issues have never been properly resolved.

74.    Upon returning from the hospital from his last heart surgery in June 2022, both elevators were out of service and he could not get to his unit without being assisted.

75.    Since the condemnation of the building, Mr. Anderson stayed in the city-funded hotels until the city no longer funded that relief on July 14, 2022. Mr. Anderson has since been paying out-of-pocket for a hotel and has not been able to find permanent housing.

76.    He currently has no permanent housing plan and the stress of the situation is causing him to feel depressed and anxious about what lies ahead.

**LINDA CHARITY**

77.    Linda Charity is a 69-year-old single, black female who has lived at Seaview since 2007 in apartment 8-B. She has endured major back and knee surgeries and has some mobility issues.

78.    Ms. Charity worked in maintenance for the building under the old ownership from 2007-2020. Mr. Weinstein terminated all of the existing staff after buying the property. She was on the Covid Rent Relief Program and is retired and on Social Security.

79.    Over the last two years, she has seen nearly a year without working heat or air conditioning in her unit, from January to July 2021 and again from October 2021 to January 2022.

80.    The elevators were out for several weeks in late March/April 2022, which made it extremely challenging for her to walk eight flights of stairs to and from her apartment.

81.    Ms. Charity recalls, when she was working for the building, there was an elevator company on-call they simply reported issues to, and the on-call elevator company would send out

workers to repair the elevators when they were malfunctioning.

82.    Ms. Charity has experienced consistent flooding and water leaks in her apartment. She also has roach and mice infestation issues that have gotten worse since the new owner stopped using a pest control service in early 2022.

83.    Since the condemnation of the building, Ms. Charity has been staying with her sister in Hampton. This is not a permanent option, but has provided temporary housing.

84.    Ms. Charity's biggest concern is that she will not be able to afford a new apartment. Since she worked for Seaview, she was grandfathered-in on an employee rate that does not increase, a lease granted by the former building ownership to protect her. Ms. Charity pays only $588 per month and will not be able to find similar circumstances.

**GLORIA PARKER**

85.    Gloria Parker is a disabled 75-year-old, widowed black female living at Seaview Lofts since 2019. She suffers from back issues from several surgeries as well as kidney issues, high blood sugar, and, since moving in, has developed lung scarring, chronic obstructive pulmonary disease (COPD), and now requires oxygen.

86.    Ms. Parker proudly pays her rent in full every month and even did so during the entire six months she was hospitalized in a facility after a fall in her apartment.  Her income is all from Social Security.

87.    Ms. Parker experienced constant leaks in her living room ceiling, kitchen and bathroom. Every time that it stormed, the walls and ceilings would swell, get moisture spots and mold. She would report the issues, but maintenance have never addressed the underlying leaks.

88.    In October 2021, a major leak occurred that created so much damage above her living room, kitchen, and bathroom, the ceiling itself sagged and nearly caved in.

89.    In November of 2021, the leaks were causing water pooling in places and it caused Ms. Parker to slip and fall.

90.    Shortly after the fall, Ms. Parker started having difficulty breathing and ultimately was admitted to the hospital in November 2021 and stayed hospitalized with a variety of health issues until April 2022.

91.    During this time, her daughter regularly communicated with management to ensure all repairs were being made to fix the leaks and make her apartment livable upon her return.

92.    Ms. Parker's daughter was not satisfied with the work being done by maintenance and requested a call with Mr. Weinstein himself. He assured her that everything would be ready for her mother.

93.    Upon discharge, the apartment was not ready, however Defendant Weinstein said that she could move into an apartment on the second floor but it would cost more per month. However, that apartment did not end up being ready as promised and Ms. Parker had to pay for a nursing home in the interim.

94.    Ms. Parker was finally able to move into a different unit, 2-K, in June 2022, where she spent only a few weeks before the building was condemned.

95.    Since the condemnation of the building, Ms. Parker stayed in the city-funded hotels until the City no longer funded that relief on July 21, 2022 (Ms. Parker's relief was extended by the City by one week due to her disability).

96.    The condemnation has caused the Parkers extra expenses and unneeded stress during an already stressful time. All of the in-home care nurses and professionals that visit Ms. Parker for weekly treatments is out of the territory for her existing home health care folks, so Ms. Parker's daughter has been driving her back and forth to a friend's home for her regularly

scheduled visits.

97.    Ms. Parker is confused and worried. Her breathing and health have been affected, her finances have been affected, and there are waiting lists at all of the apartments/senior living places she has looked into.

**MAJOR PURYEAR**

98.    Major Puryear is a 53-year-old disabled, black male that has lived in Seaview Lofts with his brother, John Towler, since Sept 2017.

99.    He is a diabetic who is scheduled to have a foot amputated. He lives in Apartment 7-G. He was on the Covid Rent Relief Program and his monthly income is from part-time employment at Cool Wave Wash.

100.    Mr. Puyear has experienced numerous maintenance issues that have continually gone unresolved such as: black mold, exposed holes in ceilings from moisture/leaks, leaks during storms, the building's air conditioning was out for most of summer 2021, and the building's heat was out for several months from late 2021 until early 2022.

101.    It was a challenge for Mr. Puryear to climb the stairs to his seventh floor apartment. However, he has the responsibility of caring for his disabled brother and would have to leave the apartment if either of them needed anything.

102.    Since the condemnation of the building, Mr. Puryear stayed in the city-funded hotels until the City no longer funded that relief on July 14, 2022. Because Mr. Puryear was not yet on full disability, the City denied any additional assistance for him.

103.    He is currently homeless and is dealing with depression and anxiety from his current situation.

**WILLIE BACKUS**

104.    Willie Backus is a 56-year-old, disabled black male that lived in Seaview Lofts prior to its condemnation.

105.    Mr. Backus is on oxygen and ambulates with the assistance of a cane.

106.    Mr. Backus has experienced most of the same failures, dangers, and difficulties alleged herein generally.

**JOHNNY MCKOY**

107.    Mr. McKoy is a 47-year-old, black male that lived in unit 10-A at the Seaview Lofts prior to its condemnation.

108.    Mr. McKoy has knee issues and hypertension, making climbing stairs very difficult.

109.    Mr. McKoy has experienced most of the same failures, dangers, and difficulties alleged herein generally.

**MARY JOHNSON**

110.    Ms. Johnson is a 67-year-old, black female that lived in Seaview Lofts, Apt. 8-J, prior to its condemnation.

111.    Ms. Johnson is a senior with asthma, making climbing stairs very difficult.

112.    Ms. Johnson has experienced most of the same failures, dangers, and difficulties alleged herein generally.

**SALVADORE COOPER**

113.    Salvadore Cooper is a 60-year-old black male that lived in Seaview Lofts prior to its condemnation.

114.    Mr. Cooper a history of heart problems.

115.    Mr. Cooper has experienced most of the same failures, dangers, and difficulties alleged herein generally and by other tenants including being displaced and becoming homeless.

**RADIA CAPEHART**

116.    Radia Capehart is a 48-year-old female that lived in Seaview Lofts prior to its condemnation.

117.    Ms. Capehart has a history of back problems and post-traumatic stress disorder.

118.    Ms. Capehart has experienced most of the same failures, dangers, and difficulties alleged herein generally, including water leaks and damages.

**JOE BRANCH**

119.    Joe Branch is a 50-year-old black male that lived in Seaview Lofts prior to its condemnation.

120.    Mr. Branch has a history of diabetes and hypertension.

121.    Mr. Branch has experienced most of the same failures, dangers, and difficulties alleged herein generally.

**PEGGY ADAMS**

122.    Peggy Adams is a 56-year-old, disabled black female that lived in Seaview Lofts, Apt. 6-A, prior to its condemnation.

123.    Ms. Adams has a history of knee problems and is diabetic.

124.    Ms. Adams has experienced most of the same failures, dangers, and difficulties alleged herein generally, including water.

**JASON SKEETE**

125.    Jason Skeete is a 25-year-old, disabled black male and military veteran that lived in Seaview Lofts, Apt. 9-B, prior to its condemnation.

126.    Mr. Skeete has a history of back and neck problems as well as asthma.

127.    Mr. Skeete has experienced most of the same failures, dangers, and difficulties

alleged herein generally.

128.    Each Plaintiff suffered substantial actual harm through their loss of use and enjoyment of their home, physical difficulties and exasperation of physical injury caused by the lack of available elevators and mobility, affront to the plaintiff's dignity, embarrassment, and the damage the plaintiff's self-image, and the resulting mental and emotional distress from all of these.

## CLASS ACTION ALLEGATIONS

129.    This case is brought as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), on behalf of the following class (the "Class"):

> All persons (a.) over the age of 65, (b.) with a physical impairment which substantially limits his or her mobility up and down stairs and/or (c.) with a record of having such an impairment, who resided on the second floor or higher in the Seaview Loft Apartments at any time during the two years preceding the filing of this Complaint and during a period in which the two elevators therein were not operating for at least one day.

130.    *Numerosity*:  The proposed Class is sufficiently numerous as to render joinder impractical. Upon information and belief, the Class includes over 75 individuals. Class members are geographically located in the City of Newport News, Virginia. These individuals are known through Defendant's records and existing objective evidence (including DMV and medical records of disability or mobility conditions), and can be provided direct notice of this action.

131.    *Commonality*: Common questions of law and fact affect all members of each class, including, by example only and without limitation: whether Defendants' mis-, mal- and non-feasance alleged herein constituted a "discriminatory housing practice" as defined and prohibited by the FHA, what injunctive remedy is appropriate and whether Defendants' violations were willful.

132.    *Typicality:* The claims of Plaintiffs are typical of the claims of the  Class. Plaintiffs allege the same violations and misconduct, all resided in the same Apartment building

during a narrow time period and would each prove the same willful violations.

133.    *Adequacy:* The named plaintiffs will fairly and adequate protect the interests of the proposed Class. Plaintiffs' claims are identical to the claims of the class members, they have no relevant conflicts of interest with other members of the proposed classes, and they have retained competent counsel experienced in class actions, unemployment compensation and constitutional law.

134.    This action may also be maintained under Federal Rule of Civil Procedure 23(b)(2) because Defendants acted (or, also appropriately here, failed to act) in ways that apply generally to members of each class, so that final injunctive relief and corresponding declaratory relief is appropriate with respect to each class as a whole.

135.    Management of this action as a class action will not present any likely difficulties that are greater for prosecution of the violations on a class basis.

136.    In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

137.    In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

## COUNT ONE: THE FAIR HOUSING ACT 42 U.S.C. § 3604(h)

138.    The Seaview Lofts apartment building is a "dwelling" available "to rent" within the meaning of the Fair Housing Act (FHA), 42 U.S.C. § 3602.

139.    In 1968, Congress enacted the Fair Housing Act, prohibiting discrimination on the basis of race, gender, national origin, and religion in the provision of housing. In 1988, through Fair Housing Amendments Act, Congress extended the Act's protections to people with

disabilities.

140.    Under the Fair Housing Act, it is illegal "[to] discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of [the disability] of. . .that buyer or renter [or the disability of] a person residing in or intending to reside in that dwelling after it is . . . rented." 42 U.S.C. § 3604(f)(1).

141.    Under the Fair Housing Act, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a [disability] of . . . the person." 42 U.S.C. § 3604(f)(2).

142.    Defendants violated each of these provisions and discriminated against each Plaintiff and member of the putative class when they refused and failed to fix, maintain and operate the elevators.

143.    Based upon the foregoing, Defendants have violated the protections afforded to Plaintiffs and the Class under the FHA, by failing and refusing to provide an accessible path to and through the building and refusing, for an extended period of time, to make necessary repairs to the elevator and/or lift which form a necessary component to that accessible path; failing and refusing to make reasonable accommodations in policies, programs and procedures when such is necessary to afford Plaintiffs an equal opportunity to use and enjoy the dwelling; failing and refusing to make the common use areas at the building readily accessible and useable by handicapped persons; and failing and refusing to make the dwelling units adaptable to tenants with disabilities.

144.    Defendants have constructive knowledge that accommodations are necessary when the elevators break down. Defendants also had actual knowledge that Plaintiffs and Class members

were persons with a mobility disability who required accommodation when the elevator is out of order.

145.    When Plaintiffs have requested reasonable accommodations of their disabilities during elevator and lift outages, Defendants have variously delayed responding, refused to pay for the hotel rooms in advance, failed to reimburse Plaintiffs for their costs and refused to provide safe accommodations, which conduct has operated as an effective denial or put the Plaintiffs through hardship.

146.    Defendants maintain a pattern and practice of denying Plaintiffs full and equal access to their dwellings by failure to maintain accessible paths or travel, and failure to respond appropriately to service outages.

147.    By terminating the use of the elevators for an extended period time, Defendants knew or should have understood that they were disparately harming Plaintiffs and other Class members more than other mobile residents, due to their disabilities. They are providing diminished conditions, privileges, services, and facilities to her, as other residents may be able to access their unit via the stairs in the building. Defendants' actions constitute discrimination in violation of the FHA.

148.    Defendants were and continue to be well aware of the Plaintiffs' and class members' disabilities and the elevator situation in the building.

149.    Further, whether or not Defendants knew of each and every Plaintiff or Class member and their disabilities or handicaps, they certainly knew that there were handicapped persons in the Apartments who were harmed by the failure to maintain and operate the elevators.

150.    Defendants thus acted intentionally, willfully, and/or in reckless or callous indifference and disregard of the Plaintiffs' and Class Members' federally protected rights.

151.    Accordingly, pursuant to Rule 23(b)(2) and 42 U.S.C. § 3613(c), Plaintiffs seek on their own and on the Class's behalf injunctive and declaratory relief: (a.) declaring that Defendants' acts constitute discrimination under the Fair Housing Act 42 U.S.C. § 3604; (b.) ordering Defendants immediately to fix the elevators in the building; (c.) ordering Defendants to create a policy on reasonable accommodations and FHA compliance; (d.) granting such other equitable relief determined appropriate.

152.    In addition to the requested injunctive relief, Plaintiffs are each entitled to and herein seek actual damages and punitive damages pursuant to 42 U.S.C. § 3613(c).

WHEREFORE, Plaintiffs pray for judgment and the following specific relief against each Defendant, joint and severally as follows: (a.) certification of the case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and as pled herein; (b.) equitable, declaratory and injunctive relief as pled herein; (c.) compensatory damages for the named Plaintiffs; (d.) punitive damages against each Defendant for the named Plaintiffs, (e.) for their attorneys' fees and costs; (f.) for prejudgment and postjudgment interest at the legal rate, and (g.) for such other legal or declaratory relief as the Court does deem just, equitable, and proper.

**JURY TRIAL IS DEMANDED**

August 4, 2022

Respectfully Submitted,

**PLAINTIFFS**

By:_____*/s/ Leonard A. Bennett*_____
Leonard A. Bennett, VSB #37523
Craig C. Marchiando, VSB #89736
**Consumer Litigation Associates, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

Email: craig@clalegal.com


Drew D. Sarrett, VSB #81658
**Consumer Litigation Associates, P.C.**
626 E. Broad Street, Suite 300
Richmond, VA 23219
Telephone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

James W. Speer, VSB#23046
**Virginia Poverty Law Center**
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org


Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
**KellyGuzzo, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com